# UNITED STATES DISTRICT COURT

## District of Maine

| | |
|---|---|
| SHARON LEAHY-LIND, | ) |
|     Plaintiff | ) |
| v. | ) |
| MAINE DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTER FOR DISEASE CONTROL AND PREVENTION, | ) **COMPLAINT** |
|     and | ) |
| SHEILA G. PINETTE, in her individual capacity, | ) |
|     Defendants | ) |

Plaintiff, Sharon Leahy-Lind, through her counsel, alleges as follows:

## Parties

1. Plaintiff, Sharon Leahy-Lind ("Sharon"), is a resident of Portland, Maine.

2. Defendant, Maine Department of Health and Human Services, Center for Disease Control and Prevention ("CDC"), is a "public agency" pursuant to 29 U.S.C. § 203(x).

3. Defendant, Sheila G. Pinette, the Director of the Maine CDC ("Pinette"), is an individual who at all material times has resided in Cape Elizabeth, Maine and is being sued in her individual capacity.

## Jurisdiction

4. This Court has original jurisdiction under 28 U.S.C. § 1331.

5. This Court has concurrent jurisdiction to hear Plaintiff's state law claims.

## Venue

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all of the events giving rise to Sharon's claims occurred in this District.

## Facts

7. On or about January 1, 2012 Sharon was promoted to serve as the Director of the Division of Local Public Health for the Maine CDC. Prior to this she worked from 2008 to 2012 for the CDC as the Public Health Liaison in Sanford, Maine.

8. Sharon's previous professional experience in public health included working at the Maine Department of Health and Human Services as the Director of Special Projects, Women's Health Coordinator (2002 – 2008) and Project Director, Women's Behavioral Health Systems Initiative, Division of Family Health (2004 – 2007).

9. At all material times Sharon performed her job at a very high level and was recognized for outstanding abilities, attitude and professionalism.

10. Sharon has a bachelor's degree from Worcester State College and a master's degree from the Edmund S. Muskie School of Public Service at the University of Southern Maine.

11. In the spring of 2012, in connection with a major reduction in state funding for the Healthy Maine Partnerships ("HMP") programs, Sharon was told by her supervisor, the Deputy Director of the Maine CDC ("DD"), to shred public documents that would have disclosed irregularities and possibly illegal activity by the CDC.

12. The records in question showed certain scoring results, among other things, purportedly used to designate nine "lead" HMP programs that were awarded large sums of public funding while other HMPs' funding was radically reduced. What was described as an

"objective" test on which awards were allegedly based was in fact manipulated by Pinette, the DD and the Director of Minority Health ("DOMH") so certain HMP's were favored over others.

13. Sharon refused to shred any documents because she reasonably believed disposing of public records was illegal and highly inappropriate. Instead, Sharon reported to several high-level officials at the CDC, including Pinette, that she was told to shred documents and that she refused.

14. Sharon kept all of the records related to the HMP funding in her files in her office at the CDC.

15. When the DD found out Sharon had not shredded the documents in question, she physically assaulted and ordered her to take the documents home and destroy them there, but Sharon refused.

16. In August and September, 2012 Sharon reported to Pinette that the DD had ordered her to shred public documents and had been harassing and physically assaulting her, as well as ordering her to harass and discriminate against others. Sharon gave her specific details of what the DD had been doing since January when she took the position, and how it got worse after she refused to shred documents. Pinette responded by saying that the DD did "the same things" to her, and that, "Chris Zukas is a miserable and hateful person." Pinette also said she would have to report the harassment to the Commissioner. The DOMH later said to Sharon, "Sharon, Chris (the DD) can never know that you came forward. If she finds out she will destroy you—things will get much worse for you."

17. During that time and thereafter, Pinette, the DD and/or the DOMH harassed, discriminated and retaliated against Sharon to such a degree that an intolerable hostile

environment was created, and Sharon suffered a serious health condition and took a medical leave.

18. Specific acts committed by Pinette, the DD and/or DOMH include:

(a) Sharon was ordered to repeatedly discipline a disabled minority employee who was targeted by the DD and DOMH as part of a systematic effort by the CDC to harass and discriminate against minorities. The DD and the DOMH told Sharon to "keep on her" so they could "get rid of her". On one such occasion, the DOMH (while at the CDC office) called Sharon (who was out of the office) and told her to discipline this employee for wearing jeans. When Sharon questioned why she should be addressing this alleged offense while out of the office and unable to personally observe the de minimis infraction, the DOMH said aggressively, "you <u>will</u> discipline her, Sharon, or you will be disciplined! I will make sure the DD fires you!"

(b) Similar threats of adverse action were repeatedly made by both the DD and DOMH to Sharon if she did not carry out a campaign targeting this minority employee with discipline in an attempt to get rid of her.

(c) Inappropriate racial and religious comments made by Pinette, DD and the DOMH contributed to a hostile environment. For example, Pinette said at a public meeting, "my daughter doesn't have a job, but of course her colored roommate got one because of affirmative action."

(d) Pinette publicly referred to her personal religion numerous times, suggesting she was morally superior to Sharon and others of different faiths. Comments included, "I'm Catholic, that means I am telling the truth," or words to that effect. On another occasion, Pinette said to a large number of CDC employees that Sharon and another employee who reported illegal behavior are "liars".

(e) The DOMH, speaking of the HMP funding, said, "I am going to take away all the money from that skinny white bitch."

(f) The DD told Sharon to keep an eye on "them", referring to a group of minorities who were talking amongst each other at the CDC.

(g) Sharon was told by the DOMH, "shut your f'ing mouth" and was threatened with adverse employment consequences if she mentioned what appeared to be favorable treatment given to the Tribal Healthy Maine Partnerships.

(h) Sharon was physically and verbally assaulted repeatedly by the DD. The DD often raised her voice and screamed, while grabbing Sharon's arm or kicking her under the table. The DOMH was sometimes overly "friendly" and suddenly very aggressive and would scream at Sharon, calling her a "stupid ass goody-two shoes" while criticizing the way Sharon talked.

(i) The DOMH and DD discouraged Sharon from questioning unethical employment practices and favoritism, such as handing out jobs and benefits to friends or political allies instead of basing hiring decisions on merit and objective standards.

(j) In early November, 2012, Sharon was ordered to fail a CDC employee on his probation for reasons that had nothing to do with his job performance. The DD and DOMH told Sharon, falsely, that he had been the subject of numerous sexual harassment complaints. Sharon thoroughly reviewed this employee's personnel file and references and found no evidence of any such charges. She confirmed his good record with the personnel office and had personally observed him doing a satisfactory job. Sharon was extremely reluctant to fail him, but when asked by Pinette whether it was the right thing to do, she was so afraid of reprisal by the DD and the DOMH that she agreed to carry out the directive. Sharon was told specifically by the DD and the DOMH that if she did not fail this employee (essentially fire him), <u>she</u> would be

disciplined and that her job was on the line. Shortly after Sharon delivered the news to this employee, however, the DD called Sharon in a rage and ordered her to reinstate him. The DD screamed at Sharon on the phone and demanded that the employee be contacted immediately. The DD told Sharon if she did not "unfail" this employee, she would be fired. Sharon said, among other things, "This is so sick I can't take it anymore. I am so sick of the harassment and being bullied." This incident caused such heightened anxiety that Sharon had difficulty breathing.

19. On November 5, 2012, following the above-described incident, Sharon sent urgent messages to the Commissioner of the Department of Health and Human Services and others, including its EEO officer, saying that she was being harassed and needed help.

20. Sharon spoke at length with the Department's EEO officer and reported what was happening to her and others at the CDC, including being asked to engage in illegal behavior, corruption, discrimination against minorities, harassment and bullying.

21. The Department EEO officer told Sharon she would assist her with services and resources available, but the State EEO officer would investigate her complaints. Later that day, Sharon's email was acknowledged by Pinette, and she was told her claim of harassment would be reviewed.

22. Sharon sought medical attention because of difficulty breathing and extreme anxiety caused by the DD and the DOMH, and Pinette who failed to prevent or stop them. Sharon's doctor strongly recommended she take time off from work to regain her health, and she was granted family medical leave through March 25, 2013.

23. At no time in her career with the Department of Health and Human Services and the CDC was Sharon's work performance the subject of any criticism. Never had she been

disciplined or counseled. At no time was Sharon informed that anything she had done was under review or contrary to standards or performance expectations. Nothing in Sharon's personnel file reflects anything negative or the subject of review.

24. On or about November 13, 2013 Sharon met with the State of Maine's EEO Coordinator for over three hours and reported in detail what was going on at the CDC. Sharon reported she was ordered to shred and take home public documents that were the subject of a Freedom of Information Act request. Sharon reported she was ordered to carry out a campaign of harassment and discrimination against minorities on behalf of the DD and the DOMH. Sharon reported she was screamed at, threatened and physically assaulted. Sharon reported she was ordered to fail a qualified state employee for discriminatory reasons and then immediately told to reinstate him, or she would be fired. Sharon reported that the HMP funding process was unfair and unethical. Sharon also gave the state EEO Coordinator a list of people to contact to corroborate her complaints.

25. Upon information from a reliable source, instead of conducting an investigation in to Sharon's reported complaints of harassment and corruption, the State EEO Coordinator, Pinette and the CDC interviewed employees about Sharon's management performance and attempted to elicit damaging information to discredit and undermine her concerns. The minority employee who the DD and the DOMH targeted for discrimination and harassment was not, upon information and belief, interviewed, nor were numerous District Liaisons who were impacted by the HMP funding scandal.

26. Sharon asked at least three times thereafter what, if anything, was being done in response to her EEO complaint. She was told it was "confidential". She later learned that a

report was prepared by the State EEO Coordinator after interviewing numerous people and delivered to Pinette.

27. On February 4, 2013, through counsel, Sharon requested a copy of specific public documents and files left at her office pursuant to Maine's Freedom of Access Law. When documents were finally produced, the spreadsheet that identified the final scores of the Healthy Maine Partnerships – the one that Sharon was told to shred – was missing.

28. Sharon also requested a complete copy of her personnel file, which was produced on or about February 26, 2013.

29. In anticipation of her return to work in March, the Department offered Sharon a demotion to a job based in Rockland (over two hours from her home) or a return to her job as Director of the Division of Local Public Health still under the supervision of the DD, stating "the Department believes it has addressed the concerns raised regarding the supervisor." What the Department and/or the CDC did to "address" Sharon's concerns was not revealed to her.

30. On March 25, 2013, at the end of her family leave, Sharon notified the Department that she would be returning to her job and delivered a note from her doctor stating she was fit for employment with no restrictions.

31. On March 28, 2013 Sharon was placed on administrative leave and told for the first time the Department had "probable cause" to conduct an investigation into allegations that she "shared inappropriate and/or untruthful information with supervisors, subordinates, and/or peers to include, but not limited to, confidential information from senior management discussions." Sharon was never questioned by anyone at the Department or CDC about these allegations and was never told what she allegedly revealed that was inappropriate or untruthful, even after her lawyer specifically asked for details and the basis of the administrative leave.

32. In fact, Sharon was placed on administrative leave because she had reported illegal conduct and complained of discrimination and harassment, and Pinette did not want her to return to her job.

33. Although the "investigation" concluded no wrong doing, Sharon was denied from truly having her job back when she finally was allowed to return to work on or about April, 2013. Her hours were restricted and she was held to different standards than before her leave and EEO complaint, or to the hours and standards of any other Directors at the CDC. Sharon was not given discretion to hire direct reports, and employees who voiced support for her were targeted for maltreatment and harassment. Sharon was no longer "buzzed in" to the Human Resources Department and instead was escorted. She was not given an office phone, was micromanaged and unfairly "counseled" for trivial matters, while the DD and the DOMH enjoyed complete freedom to continue to harass and bully other CDC employees with impunity. Pinette publicly suggested Sharon was causing CDC employees to suffer stress and anxiety and that Sharon should feel guilty for voicing complaints about an intolerable work environment.

34. Instead of being allowed and supported to do her job upon her return to the CDC, Sharon was the subject of a witch hunt and publicly discredited and slandered. Pinette, DOMH and DD conspired with other CDC employees to make false complaints that Sharon was a "safety threat". They made false statements about Sharon's mental health, stated publicly she was a liar and untrustworthy, shot her nasty looks and treated her with disdain. When Sharon reported these things, the Department and CDC responded only that, "your concerns have been reviewed and the department believes it has taken appropriate action." In fact, no meaningful action was taken to address Sharon's concerns and prevent her from being retaliated against.

35. On July 31, 2013, after Sharon was asked to be a party to a hiring process she felt was unfair and denied her the ability to employ the best qualified candidate, in addition to being the subject of unfounded complaints by the DD and the DOMH, the conditions of her employment became intolerable.

36. On August 14, 2013 Sharon made a request through her lawyer for certain public records she believed may corroborate her claims about the CDC work environment. She made a formal request pursuant to 1 M.R.S.A. § 408-A for a "Cultural Competency Report" on which the CDC spent significant sums of taxpayer money and is a public document.

37. The CDC refused to provide Sharon a copy of this report.

**Count 1 – Whistleblower Protection Act, 26 M.R.S.A. § 831, *et seq*.**

38. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

39. Sharon at all material times was an "employee", and the CDC an "employer" under the Whistleblower Protection Act.

40. Sharon made a legally-protected whistleblower report, or reports, in good faith of what she reasonably had cause to believe were violations of law or rules of the State of Maine and/or the United States. Reports included unlawful discrimination of minorities, retaliation, assault, unfair hiring practices, political patronage and the shredding of public records.

41. Sharon's legally-protected whistleblower report or reports were the cause, and/or a substantial or motivating factor in the Defendants' threats, investigation, administrative leave, discipline, unfair treatment and/or adverse employment actions described herein, including her discharge from employment.

42. Sharon has fully complied with the procedural requirements of 5 M.R.S.A. § 4612(6).

**Count 2 – State Family Medical Leave Act, 26 M.R.S.A. § 843, *et seq*.**

43. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

44. The CDC is an "employer" subject to the Family Medical Leave Act, and Sharon was at all material times an eligibly employee.

45. Sharon requested and was granted medical leave by the CDC due to her serious health condition.

46. By denying Sharon her job back following her medical leave, harassing, discriminating and retaliating against her, the CDC violated the Maine Family Medical Leave Act.

**Count 3 – Federal Family Medical Leave Act, 29 U.S.C. § 2611**

47. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

48. At all material times Sharon was an "eligible employee" as defined by 29 U.S.C. § 2611(2)(A), and the CDC an "employer" under the Federal Family Medical Leave Act.

49. Sharon requested and was granted medical leave because of a serious health condition.

50. By committing the aforementioned acts, including but not limited to denying her return to work, discriminating and retaliating against her, the CDC unlawfully interfered with Sharon's rights in violation of 29 U.S.C. § 2615, et al.

### Count 4 – Retaliation – Maine Human Rights Act, 5 M.R.S.A. § 4572(E)

51. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

52. Sharon was unlawfully discriminated against because she opposed practices and reported what she reasonably believed to be unlawful employment discrimination in violation of the Maine Human Rights Act, as well as participated in related investigations.

53. Sharon has fully complied with the procedural requirements of 5 M.R.S.A. § 4612(6).

### Count 5 – Retaliation – Federal Civil Rights Act, 42 U.S.C. § 2000e-3

54. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

55. Sharon was unlawfully discriminated against because she opposed practices and reported what she reasonably believed to be unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, as well as participated in related investigations.

56. Sharon has complied with the procedural requirements of 42 U.S.C. § 2000e-5.

### Count 6 – Freedom of Information Act, Appeal, 1 M.R.S.A. § 409

57. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

58. Sharon made a formal request for copying and/or inspection of public records pursuant to 1 M.R.S.A § 408-A. The CDC has failed to respond or allow for the copying and/or inspection of these records in violation of Maine law.

59. The Maine CDC has willfully violated Maine's Freedom of Access Law and Sharon's rights by refusing to produce, destroying or otherwise concealing public records.

## Count 7 – Defamation

60. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

61. Pinette made false and defamatory statements about Sharon that were not privileged.

62. Pinette's statements included, but are not limited to, that Sharon "is a liar".

63. Pinette published these statements to third parties.

64. Pinette's published, unprivileged false statements are actionable irrespective of special harm or caused special harm.

## Count 8 – First Amendment – Retaliation, 42 U.S.C. § 1983

65. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth at length herein.

66. Sharon exercised her First Amendment rights when she spoke publicly and/or to the press about the work environment at the CDC.

67. Pinette, acting in her individual capacity and under color of state law, violated Sharon's First Amendment rights and unlawfully retaliated against Sharon for exercising such rights in violation of 42 U.S.C. § 1983 by committing the aforementioned acts.

**WHEREFORE**, the Plaintiff respectfully requests the following relief:

1. Declare the actions of Defendants to be unlawful;

2. Award Plaintiff damages;

3. Award the Plaintiff reasonable attorneys' fees, costs and interest;

4. Order the Defendants to reinstate Sharon or, in lieu of reinstatement, order back pay and front pay;

5. Award all allowable penalties, nominal and statutory damages; and

6. Award all further relief which this Honorable Court deems just and appropriate.

DATED at Portland, Maine this 21st day of October, 2013.

                */s/Cynthia A. Dill*
                Cynthia A. Dill, Esq.
                Maine Bar No. 7055
                Attorney for Plaintiff, Sharon Leahy-Lind

TROUBH HEISLER, PA
511 Congress Street, 7th flr
PO Box 9711
Portland, ME 04104-5011
(207) 780-6789
cdill@troubhheisler.com