## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

SHARON LEAHY-LIND,                )
                                  )
                Plaintiff,        )
                                  )
v.                                )   Docket no. 1:13-cv-00389-GZS
                                  )
MAINE DEPARTMENT OF HEALTH        )
AND HUMAN SERVICES, CENTER        )
FOR DISEASE CONTROL AND           )
PREVENTION, and DR. SHEILA G.     )
PINETTE,                          )

                Defendants.

## ORDER ON MOTION TO DISMISS AND MOTION TO AMEND

Before the Court are a series of motions related to Plaintiff Sharon Leahy-Lind's allegations concerning conduct at Defendant Maine Department of Health and Human Services, Center for Disease Control and Prevention (the "CDC") from the spring of 2012 to the spring of 2014. On October 21, 2013, Leahy-Lind filed her Complaint (ECF No. 1), naming the CDC and Defendant Dr. Sheila G. Pinette as defendants. On December 20, 2013, the CDC and Pinette filed their Motion To Dismiss In Part And Incorporated Memorandum Of Law (ECF No. 5) ("Motion to Dismiss"). On that date, Pinette also filed a Motion for a More Definite Statement (ECF No. 6).

On February 21, 2014, Leahy-Lind moved to amend her complaint. (Pl.'s Mot. to Amend Compl. with Incorporated Mem. of Law (ECF No. 27) ("Motion to Amend").) Through the Motion to Amend, Leahy-Lind seeks to add Katie N. Woodbury as a plaintiff, Christine Zukas and Lisa Sockabasin as defendants and to assert several additional counts on her and on Woodbury's behalf. The CDC and Pinette oppose the Motion to Amend (ECF Nos. 32 & 33). In addition,

Zukas and Sockabasin filed Motions to Intervene in order to object to the Motion to Amend. (See Mot. of Prospective Def. Christine Zukas for Leave to Intervene or Specially Appear for Purpose of Filing Attached Objection to Pl.'s Mot. to Amend Compl., and Incorporated Mem. of Law (ECF No. 31) ("Zukas Motion to Intervene"); Mot. of Prospective Def. Lisa Sockabasin for Leave to Intervene or Specially Appear for the Purpose of Filing Objection to Pl.'s Mot. to Amend Compl. with Incorporated Mem. of Law (ECF No. 34) ("Sockabasin Motion to Intervene").)

For the reasons explained below, the Court GRANTS IN PART and DENIES IN PART the Motion to Amend, adding Katie N. Woodbury as a plaintiff and Christine Zukas and Lisa Sockabasin as defendants. The Court finds that Count III of the Original and Amended Complaint fails to state a claim and is futile, and, therefore, GRANTS the Motion to Dismiss as to Count III. The Court finds that Count VII of the Original and Amended Complaint asserting defamation against Pinette fails to state a claim and is futile, in part. Therefore, the Motion to Dismiss is GRANTED IN PART and DENIED IN PART as to Count VII. As to the remaining Counts, the Motion to Dismiss is DENIED. Plaintiffs shall file their Amended Complaint, without Count III for violations of the federal Family Medical Leave Act, as a separate entry on the docket by October 3, 2014. The Motion for a More Definite Statement (ECF No. 6), the Zukas Motion to Intervene (ECF No. 31) and the Sockabasin Motion to Intervene (ECF No. 34) are DENIED.

## I.     STANDARD OF REVIEW

Plaintiff Leahy-Lind has moved to amend her complaint to add three parties and additional counts pursuant to Federal Rule of Civil Procedure 15(a)(2). (Motion to Amend at 1.) Rule 15(a)(2) provides that after certain deadlines have passed, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). In this case, the opposing parties do not so consent. (See Def. Maine Dep't of Health and Human Servs.,

Center for Disease Control and Prevention's Opp'n to Pl.'s Mot. to Amend Compl. (ECF No. 32) ("CDC Opp'n") at 1; Def. Pinette's Objection to Pl.'s Mot. to Amend Compl. with Incorporated Mem. of Law (ECF No. 33) ("Pinette Opp'n") at 2.)  Pursuant to Rule 15(a)(2), leave to amend a pleading "should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), unless the amendment "would be futile, or reward, inter alia, undue or inintended delay." Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004).  Accordingly, because denial of the Motion to Amend as futile would be appropriate where the amended complaint failed to state a claim, the Court analyzes the Motion to Amend pursuant to the standard for a Rule 12(b)(6) motion to dismiss. See Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 132 (1st Cir. 2006).  In addition, Defendants move to dismiss Plaintiff Sharon Leahy-Lind's original Complaint under Federal Rules of Civil Procedure 12(b)(1) & (6).

The Federal Rules of Civil Procedure require only that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought[.]" Fed. R. Civ. P. 8(a)(1)-(3).  On a challenge under Federal Rule of Civil Procedure 12(b)(6), the Court assumes the truth of the complaint's well-pleaded facts and draws all reasonable inferences in plaintiffs' favor.  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Under Rule 12(b)(6), the Court "may consider only facts and documents that are part of or incorporated into the complaint."  United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuno, 633 F.3d 37, 39 (1st Cir. 2011) (internal citations omitted).

A viable complaint need not proffer "heightened fact pleading of specifics," but in order to survive a motion to dismiss it must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In considering a motion

to dismiss, the Court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009). Plaintiffs must include enough facts supporting a claim for relief that "nudge[] their claims across the line from conceivable to plausible." <u>Twombly</u>, 550 U.S. at 570. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." <u>Haley v. City of Boston</u>, 657 F.3d 39, 46 (1st Cir. 2011) (quoting <u>SEC v. Tambone</u>, 597 F.3d 436, 442 (1st Cir. 2010)); <u>see also</u> <u>Iqbal</u>, 556 U.S. at 678 (stating that the Court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"). At this point in the litigation, "the determination of whether an issue is trialworthy simply is not the same as the determination of whether a plaintiff states a claim upon which relief can be granted." <u>Bodman v. Maine, Dept. of Health & Human Servs.</u>, 720 F. Supp. 2d 115, 121 (D. Me. 2010) (denying motion to dismiss a hostile work environment claim).

## II.  BACKGROUND

### A.  Plaintiff Sharon Leahy-Lind

On January 1, 2012, Plaintiff Sharon Leahy-Lind was promoted to serve as the Director of the Division of Local Public Health for the Defendant the Maine Department of Health and Human Services, Center for Disease Control and Prevention (the "CDC"). (Compl. ¶ 7; Am. Compl ¶ 11.)[1] Defendant Sheila G. Pinette is the Director of the CDC. (Compl. ¶ 3; Am. Compl. ¶ 4.) Christine Zukas is the Deputy Director of the CDC. (Am. Compl. ¶ 5.) Lisa Sockabasin is the Director of the Office of Health Equity at the CDC. (Am. Compl. ¶ 6.) At all material times,

---

[1] Because the Court is considering the Motion to Amend in conjunction with the Motion to Dismiss, the Court will present the facts taken from both the original Complaint and the Amended Complaint. The Court notes, however, that the result of this case would be the same if the Court considered the Motion to Dismiss and the Motion to Amend separately.

Leahy-Lind performed her job at a high level and was recognized for outstanding abilities, attitude and professionalism.  (Compl. ¶ 9; Am. Compl. ¶ 13.)

In the spring of 2012, in connection with a major reduction in state funding for the Healthy Maine Partnerships ("HMP") programs, Leahy-Lind was told by her supervisor, the Deputy Director of the CDC, Zukas, to shred public documents that would have disclosed irregularities and possible illegal activity by the CDC.  (Compl. ¶ 11; Am. Compl. ¶ 15.)  The records in question showed certain scoring results, among other things, purportedly used to designate nine "lead" HMP programs that were awarded large sums of public funding while other HMPs' funding was radically reduced.  (Compl. ¶ 12; Am. Compl. ¶ 16.)  What was described as an "objective" test on which awards were allegedly based was in fact manipulated by Pinette, Zukas and the Director of Minority Health, Sockabasin, so that certain HMPs were favored over others.  (Compl. ¶ 12; Am. Compl. ¶ 16.)

Leahy-Lind refused to shred any documents because she believed that disposing of public records was illegal and highly inappropriate.  (Compl. ¶ 13; Am. Compl. ¶ 17.)  Instead, Leahy-Lind reported to high-level officials at the CDC, including Pinette and Sockabasin, that she was told to shred documents and that she refused.  (Compl. ¶ 13; Am. Compl. ¶ 17.)  In August and September of 2012, Leahy-Lind provided Pinette with details of what Zukas had been doing since Leahy-Lind took the position, and how it became worse after Leahy-Lind refused to shred documents.  (Compl. ¶ 16; Am. Compl. ¶ 20.)  Pinette responded by saying that Zukas did "the same things" to her, and that, "Chris Zukas is a miserable and hateful person."  (Id.)  Pinette also said she would have to report the harassment to the Commissioner.  (Compl. ¶ 16; Am. Compl. ¶ 20.)  Sockabasin later said to Leahy-Lind, "[Zukas] can never know that you came forward.  If she finds out she will destroy you—things will get much worse for you." (Compl. ¶ 16; Am. Compl.

¶ 20 .)  When Zukas found out that Leahy-Lind had not shredded the documents, she physically assaulted her and ordered her to take the documents home and destroy them there.  (Compl. ¶ 15; Am. Compl. ¶ 19.)  Leahy-Lind refused.  (Compl. ¶ 15; Am. Compl. ¶ 19.)

After refusing to shred the documents, Leahy-Lind was repeatedly ordered to discipline a disabled minority employee who was targeted by Zukas and Sockabasin as part of a systematic effort by the CDC to harass and discriminate against minorities and was threatened with being disciplined herself if she failed to follow orders.  (Compl. ¶ 18.a.; Am. Compl. ¶ 22.a.)  Leahy-Lind was threatened with adverse employment consequences if she mentioned what appeared to be favorable treatment given to the Tribal Healthy Maine Partnerships.  (Compl. ¶ 18.g.; Am. Compl. ¶ 22.g.)

Leahy-Lind sought medical attention because of difficulty breathing and extreme anxiety caused by Zukas and Sockabasin, and Pinette who failed to prevent or stop them.  (Compl. ¶ 22; Am. Compl. ¶ 26.)  Leahy-Lind's doctor strongly recommended that she take time off from work to regain her health, and she was granted family medical leave through March 25, 2013.  (Compl. ¶ 22; Am. Compl. ¶ 26.)

In anticipation of her return to work in March, the Department offered Leahy-Lind a demotion to a job based in Rockland (over two hours from her home) or a return to her previous job under the supervision of Zukas.  (Compl. ¶ 29; Am. Compl. ¶ 33.)  The Department stated that it "believes it has addressed the concerns raised regarding the supervisor."  (Compl. ¶ 29; Am. Compl. ¶ 33.)

On March 25, 2013, at the end of her family medical leave, Leahy-Lind notified the Department that she would be returning to her job.  (Compl. ¶ 30; Am. Compl. ¶ 33.)  On March 28, 2013, Leahy-Lind was placed on administrative leave and told that the Department had

"probable cause" to conduct an investigation into allegations that she "shared inappropriate and/or untruthful information with supervisors, subordinates, and/or peers to include, but not limited to, confidential information from senior management discussions." (Compl. ¶ 31; Am. Compl. ¶ 35.) The investigation concluded no wrong doing. (Compl. ¶ 33; Am. Compl. ¶ 37.)

On April 2, 2014, Leahy-Lind filed a Charge of Discrimination with the Maine Human Rights Commission (the "Charge"). (Am. Compl. ¶ 38.) The Charge was published in the media and reported on widely. (Id.) On April 4, 2013, Leahy-Lind publicly stated to the media:

> I have devoted 13 years of my life and career to the State of Maine's public health because I firmly and passionately believe that healthy communities are the bedrock of a civilized and peaceful world.
>
> Public health programs that help the poor, elders, disabled and underserved in our rural state, and the scarce public dollars that support these programs, are critically important to everyone -- especially Maine's women and children.
>
> More importantly than public health, however, is the public's trust in our government.
>
> It is for this reason that I have filed my complaint. Sunshine is the best disinfectant, and it is my goal to shine light on one area of state government that is broken and causing harm to me and the people of Maine.
>
> I would like to say more, but unfortunately I am not able to do so at this time on the advice of my lawyer.
>
> In closing, I wish to thank all of the people who have supported me through this process and encourage the many dedicated public servants in local and state government to continue their good work.

(Am. Compl. ¶¶ 39, 66.)

Upon her return to the CDC in early April of 2013,[2] Leahy-Lind was not supported in her job. (Compl. ¶ 34; Am. Compl. ¶ 40.) Leahy-Lind's hours were restricted and she was held to

---

[2] From the Amended Complaint, the timeline regarding when Leahy-Lind spoke to the media, returned to work and encountered the actions described in paragraph 37 of the Amended Complaint is not clear. (See Am. Compl. ¶¶ 37-39.) Construing the facts in the light most favorable to Leahy-Lind, the Court finds that the actions described in

different standards than before her speech. (Compl. ¶ 33; Am. Compl. ¶ 37.) Leahy-Lind was not given discretion to hire direct subordinates, and employees who voiced support for her were targeted for mistreatment. (Compl. ¶ 33; Am. Compl. ¶ 37.) Leahy-Lind was no longer "buzzed in" to the Human Resources Department and was instead escorted. (Compl. ¶ 33; Am. Compl. ¶ 37.) She was not given an office phone, was micromanaged and unfairly "counseled" for trivial matters. (Compl. ¶ 33; Am. Compl. ¶ 37.)

In addition, because of the Charge and public speech, Leahy-Lind was the subject of a campaign to publicly discredit her. (Compl. ¶ 34; Am. Compl. ¶ 40.) Pinette, Sockabasin and Zukas falsely stated that Leahy-Lind was a "safety threat" and falsely commented on her mental health and stated publicly that she was a liar and untrustworthy. (Compl. ¶ 34; Am. Compl. ¶ 41.) When Leahy-Lind reported these occurrences, she was told that "your concerns have been reviewed and the department believes it has taken appropriate action." (Compl. ¶ 34; Am. Compl. ¶ 41.)

The CDC hired a consultant to conduct a Cultural Competency Assessment Report ("Report") of the organization. (Am. Compl. ¶ 42.) Sockabasin told the consultant hired to conduct the Report that "Sharon is crazy." (Id. ¶ 46.) Leahy-Lind maintains that the statement by Sockabasin was made knowingly or with reckless disregard for its truth in an effort to tarnish Leahy-Lind's reputation. (Id. ¶ 47.) The Report has been maintained as confidential and not released to Leahy-Lind or the public. (Id. ¶¶ 43-44, 48, 51.)

On July 31, 2013, after Leahy-Lind was asked to be a party to a hiring process that she felt was unfair and denied her the ability to employ the best qualified candidate, the conditions of her employment became intolerable. (Compl. ¶ 35; Am. Compl. ¶ 49.)

---

paragraph 37 occurred after her public speech described in paragraphs 38 and 39. At a minimum, the actions were continuous in nature and occurred during and after the speech.

## B.    Katie Woodbury

Katie Woodbury was an office manager at the CDC and worked for Leahy-Lind when Leahy-Lind was the Director of Public Health.  (Am. Compl. ¶ 53.)  On April 21, 2013, Woodbury spoke with reporters from the Lewiston Sun Journal, echoing the concerns that Leahy-Lind had raised when she spoke publicly, including the allegation that the Healthy Maine Partnership funding was manipulated.  (Id. ¶¶ 54, 55.)  Woodbury said publicly that individuals who viewed the final scores and knew that the scores were altered "were up in arms over that because it wasn't who they picked."  (Id. ¶ 56.)  Woodbury also told the Lewiston Sun Journal that she was present when Leahy-Lind had been kicked under the table at a meeting for speaking and when Sockabasin had screamed at Leahy-Lind.  (Id. ¶¶ 57, 58.)

Woodbury spoke publicly about the work environment at the CDC.  (Am. Compl. ¶ 62.)  She said the she experienced the same treatment from Zukas as Leahy-Lind, and that "if you do not agree with [] Zukas, she's got a hair trigger and she'll rip you up."  (Id. ¶¶ 58, 59.)  She said that supervisors told employees to spy on their coworkers and retaliated against those they disliked or who challenged management.  (Id.)  She said that coworkers at the CDC fear management.  (Id. ¶ 63.)  Woodbury decided to speak publicly because she felt too much had been "shoved under the rug."  (Id. ¶ 64.)

Following Woodbury's public comments, Zukas, Sockabasin and Pinette instigated a substantial campaign of harassment against Woodbury.  (Id. ¶¶ 66, 67.)  Coworkers at the CDC were told not to speak to Woodbury.  (Id. ¶ 75.a.)  Zukas and Sockabasin followed Woodbury but refused to speak to or look at her.  (Id. ¶ 75.b.)  Emails sent by Pinette, Zukas and Sockabasin were "cheerful" and professional, but their direct communications with Woodbury were hostile, confrontational and intimidating.   (Id.  ¶  75.c.)   In meetings, they refused to acknowledge

Woodbury's presence or speak to her.  (Id.)  Woodbury was moved next to Zukas and Sockabasin's offices and ordered to sign a 1989 Executive Order that contains a Code of Conduct, even though she had previously signed all required policies and forms.  (Id. ¶ 75.d.)  Woodbury was repeatedly reassigned to different locations and supervisors.  (Id. ¶ 75.e.)  Woodbury was taken off the State Coordinating Council, where she worked as staff.  (Id. ¶ 75.f.)  Woodbury was removed from the "Idea Team" of other office managers.  (Id. ¶ 75.g.)  Woodbury was micro-managed like she had never been before speaking publicly and even though her job performance remained very good.  (Id. ¶ 75.h.)  Zukas began questioning and refusing to approve Woodbury's Time and Attendance Management forms, where that had never previously occurred in Woodbury's thirteen years of experience.  (Id. ¶ 75.i.)  Woodbury was no longer allowed to work from home on occasion to accommodate medical appointments.  (Id. ¶ 75.j.)

On August 12, 2013, Woodbury met with the Human Resources Department and reported that the actions by Zukas and Sockabasin were causing her distress.  (Am. Compl. ¶ 77.)  She asked to not have to report to them.  (Id.)  Woodbury was told, "whistleblowers get guilty consciouses," "maybe you are imagining things" and "maybe you shouldn't have talked to the newspapers."  (Id.)  On August 14, 2013, Woodbury was informed that she would be working under the direct supervision of Rebecca Petrie, who was the subject of a complaint made by Woodbury and who reports to Sockabasin.  (Id. ¶¶ 68, 78.)

**C.      September 23, 2013 Statement By Pinette**

On September 23, 2013, Pinette said publicly at a meeting where Woodbury and numerous others were present that the people who had spoken to the press about the hostile work environment at the CDC were "liars," and then went on to publicly discuss Woodbury's private medical issues, including her battle with cancer.  (Id. ¶ 80.)  After the meeting, several CDC employees came to

Woodbury and expressed shock that Pinette had said that she and Leahy-Lind were liars. (Id. ¶ 81.) Woodbury alleges that Pinette's false and defamatory statement was made knowingly or with reckless disregard to its truth or falsity. (Id. ¶ 82.)

### D. The Litigation

On October 21, 2013, Plaintiff Leahy-Lind filed her original Complaint asserting eight counts against the CDC and Pinette (ECF No. 1) ("Original Complaint"). On December 20, 2013, the CDC and Pinette moved to dismiss Original Complaint in part (ECF No. 5), and Pinette moved for a more definite statement (ECF No. 6).

On February 21, 2014, Leahy-Lind moved to amend her complaint. (ECF No. 27 ("Motion to Amend").) The proposed Amended Complaint (ECF No. 27-1) is centered on the same nucleus of events as the Original Complaint but names Christine Zukas and Lisa Sockabasin as additional defendants and Katie Woodbury as an additional plaintiff. (See Am. Compl. ¶¶ 2, 5, 6.) The Amended Complaint asserts nine counts on behalf of Leahy-Lind and two counts on behalf of Woodbury.[3] Zukas and Sockabasin filed Motions to Intervene in order to object to the Motion to Amend.

Through the Motion to Dismiss and the Oppositions to the Motion to Amend, Defendants assert that certain counts in the Original Complaint cannot survive because they fail to state a claim under Rule 12(b)(6) and that those same and additional counts in the Amended Complaint should be dismissed because they are futile. Specifically, Defendants seeks dismissal of Leahy-Lind's

---

[3] Leahy-Lind asserts causes of action for Whistleblower Protection, 26 M.R.S.A. § 831 (Count I), violations of the state Family Medical Leave Act, 26 M.R.S.A. § 843 (Count II), violations of the federal Family Medical Leave Act, 29 U.S.C. § 2611 (Count III), Retaliation, Maine Human Rights Act, 5 M.R.S.A. § 4572(E) (Count IV), Retaliation, federal Civil Rights Act, 42 U.S.C. § 2000e-3 (Count V), violations of the Freedom of Information Act, Appeal, 1 M.R.S.A. § 409 (Count VI), defamation against Pinette (Count VII), defamation against Sockabasin (Count VIII) and First Amendment Retaliation, 42 U.S.C. § 1983 (Count IX). Through the Amended Complaint, Woodbury asserts causes of action for defamation against Pinette (Count X) and First Amendment Retaliation, 42 U.S.C. § 1983 (Count XI). The CDC and Pinette oppose the Motion to Amend. (ECF Nos. 32 & 33.)

counts for violations of the federal Family Medical Leave Act (Count III of the Original and Amended Complaint), defamation against Pinette (Count VII of the Original and Amended Complaint), defamation against Sockabasin (Count VIII of the Amended Complaint) and First Amended Retaliation (Count VIII of the Original Complaint, Count IX in the Amended Complaint). Defendants seek dismissal of Woodbury's claims for defamation against Pinette (Count X of the Amended Complaint) and First Amendment Retaliation (Count XI of the Amended Complaint). The Court will discuss each Count that Defendants assert should be dismissed or is futile.

## III. DISCUSSION

### A. Violations of the federal Family Medical Leave Act

In Count III of the Original and Amended Complaint, Leahy-Lind asserts a cause of action for violations of the federal Family Medical Leave Act, 29 U.S.C. § 2611 ("FMLA"). (Compl. ¶¶ 47-50; Am. Compl. ¶¶ 94-97.) Specifically, Leahy-Lind asserts that she

> sought medical attention because of difficulty breathing and extreme anxiety caused by the Zukas and Sockabasin, and Pinette who failed to stop or prevent them. [Leahy-Lind's] doctor strongly recommended she take time off from work to regain her health, and she was granted family medical leave through March 25, 2013.

(Compl. ¶ 22; Am. Compl. ¶ 26.) Leahy-Lind further claims that she "requested and was granted medical leave because of a serious health condition" and that Defendant CDC's actions "unlawfully interfered with [Leahy-Lind's] rights in violation of 29 U.S.C. § 2615, et al."[4] (Compl. ¶¶ 49, 50; Am. Compl. ¶¶ 96, 97.) Defendants assert that Count III must be dismissed because Leahy-Lind's self-care claim is barred by the Eleventh Amendment.

---

[4] There is no indication in the Amended Complaint that Leahy-Lind is asserting this claim against any Defendant other than Defendant the CDC. (See Am. Compl. ¶ 97.)

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The Supreme Court and the First Circuit have stated that the Eleventh Amendment's "ultimate guarantee is that nonconsenting States may not be sued by private individuals in federal court." Laro v. New Hampshire, 259 F.3d 1, 5 (1st Cir. 2001) (quoting Bd. of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 363 (2001).) Two primary exceptions lie to this general rule. First, a state may waive its Eleventh Amendment immunity and consent to suit. There is no allegation that Maine, and Defendant CDC, an arm of the state, have waived their immunity. Second, Congress may abrogate a state's immunity under a valid exercise of congressional power under Section Five of the Fourteenth Amendment. Coleman v. Court of Appeals of Maryland, 132 S.Ct. 1327, 1333 (2012). As explained below, the Supreme Court has recently held that Congress did not abrogate the States' Eleventh Amendment immunity against FMLA claims for self-care. Id. at 1338.

The FMLA entitles eligible employees to take up to twelve weeks of unpaid leave during any 12-month period. 29 U.S.C. § 2601-2654. Under the FMLA, an eligible employee is permitted to take unpaid leave for: (A) "the birth of a son or daughter . . . in order to care for such son or daughter;" (B) "the placement of a son or daughter with the employee for adoption or foster care;" (C) the care of a "spouse, or a son, daughter, or parent, of the employee, if [such a person] has a serious health condition;" and, (D) "a serious health condition that makes the employee unable to perform the functions of the position of such employee." § 2612(a)(1)(A)-(D). The provisions contained in subparagraphs (A) through (C) are referred to as the family-care provisions, whereas the provision contained in subparagraph (D) is referred to as the self-care provision.

In <u>Nevada Department of Human Resources v. Hibbs</u>, the Supreme Court held that Congress acted within its authority under section five of the Fourteenth Amendment when it abrogated the States' Eleventh Amendment immunity for suits by individuals under § 2612(a)(1)(C), which grants leave for the care of a spouse, child or parent with a serious health condition. 538 U.S. 721, 740 (2003). The Supreme Court found that "the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation." <u>Id.</u> at 735. The self-care provision was not examined in <u>Nevada Dep't of Human Resources v. Hibbs</u>. <u>Coleman</u>, 132 S. Ct. at 1332.

In this case, Leahy-Lind claims that she requested medical leave because of a serious health condition of her own, and, as a result, she was discriminated and retaliated against in violation of the FMLA. (Compl. ¶¶ 22, 49, 50; Am. Compl. ¶¶ 26, 96, 97.) Her claim implicates the self-care provision of the FMLA, which was not at issue in <u>Hibbs</u>. <u>Coleman</u>, 132 S. Ct. at 1332. However, the issue of the States' Eleventh Amendment immunity under the self-care provision of the FMLA was examined in <u>Coleman v. Court of Appeals of Maryland</u>, 132 S. Ct. 1327 (2012). In <u>Coleman</u>, the Supreme Court found that the support for use of Section Five of the Fourteenth Amendment found in <u>Hibbs</u> – gender discrimination by the States in the administration of leave policies to care for others – was lacking with respect to the States' administration of self-care leave. <u>Coleman</u>, 132 S. Ct. 1334-37. The Court found that in enacting the self-care provision, Congress failed to "identify a pattern of constitutional violations and [to] tailor a remedy congruent and proportional to the documented violations." <u>Id.</u> at 1338. Accordingly, the Supreme Court held that Congress did not abrogate the States' Eleventh Amendment immunity against FMLA self-care claims. <u>Id.</u> In deciding <u>Coleman</u>, the Supreme Court explicitly upheld the First Circuit's decision in <u>Laro v.</u>

New Hampshire, 259 F.3d 1 (2001) in which the First Circuit similarly held that "the FMLA's personal medical leave provision, 29 U.S.C. § 2612(a)(1)(D) (affording leave for serious personal health conditions), insofar as it authorizes private suits against states, does not validly abrogate the states' immunity." 259 F.3d at 4; Coleman, 132 S. Ct. at 1332.

Leahy-Lind argues that her claims are different than those presented in Coleman. Leahy-Lind argues that her claim is not brought pursuant to the self-care provision found in 29 U.S.C. § 2612(a)(1)(D) but is instead brought under 29 U.S.C. § 2615. In her Original and Amended Complaint, she asserts that she requested, and was granted, medical leave because of her own serious health condition. (Compl. ¶¶ 22, 49; Am. Compl. ¶¶ 26, 96.) She does not assert that her leave was to care for anyone but herself. Leahy-Lind's medical leave implicates § 2612(a)(1)(D).

In addition, contrary to Plaintiff's argument, every FMLA claim necessarily implicates § 2615, § 2617 and a provision of § 2612(a)(1). Section 2617 provides individuals with a private cause of action for alleged violations of the FMLA and states that "[a]ny employer who violates section 2615 of this title shall be liable to any eligible employee affected." § 2617(a)(1). Section 2615 sets forth the ways an employer can violate the substantive rights created by the FMLA. Section 2612 sets forth the substantive rights, the entitlement to unpaid leave for family or self-care. § 2612(a)(1). Therefore, to assert a valid cause of action for violation of the FMLA, every plaintiff necessarily alleges a violation of § 2615 and "any claim brought against an employer for a violation of the FMLA's leave entitlements must be based on a subsection of § 2612." Humphrey v. Kansas Dep't of Wildlife, Parks & Tourism, 13-4025-JTM, 2013 WL 4857889 at *3 (D. Kan. Sept. 10, 2013) (finding plaintiff's arguments that her claim was not brought under the self-care provision of the FMLA and instead under § 2615 unpersuasive). For example, in Laro v. New Hampshire, Stephen Laro sued New Hampshire for violating § 2615 when it terminated his

employment prior to the expiration of FMLA leave that he needed to recover from his own heart bypass surgery. 259 F.3d at 4-5. The First Circuit held that Congress failed to abrogate the States' Eleventh Amendment immunity as to § 2612(a)(1)(D). Id. at 5-17. In its analysis, the First Circuit treated Laro's FMLA claim in its entirety – a violation of § 2615 for the substantive rights created under § 2612 – and upheld the dismissal of the action. Id. at 5, 17.

Leahy-Lind next argues that her case is distinguishable from the facts of Coleman because the plaintiff in Coleman was fired for requesting leave, whereas in this case, Leahy-Lind was retaliated against for actually taking leave. Plaintiff's argument recognizes that there are two theories for recovery under § 2615 of the FMLA, the retaliation/discrimination theory under § 2615(a)(2) and the entitlement/interference theory under § 2615(a)(1). See Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960 (10th Cir. 2002). However, the differences in a retaliation/discrimination claim or an entitlement/interference claim do not impact the Eleventh Amendment immunity analysis. See Humphrey, 2013 WL 4857889 at *3. In neither Hibbs, Coleman nor Laro, did the Supreme Court or the First Circuit give any indication that the underlying theory impacted the Eleventh Amendment analysis. Instead, it is the provision of § 2612(a)(1) that controls. Leahy-Lind's claim arises under the self-care provision of § 2612 and the States' Eleventh Immunity has not been validly abrogated under that provision. Coleman, 132 S. Ct. at 1338.

Finally, Leahy-Lind asserts that the issue of sovereign immunity in this case is novel and has not been previously addressed by any other court. The preceding discussion quickly dispels that argument. The Supreme Court and the First Circuit, in addition to numerous other federal courts, have directly addressed the States' Eleventh Amendment immunity against a claim brought under § 2615 for violations of the self-care provision. See Coleman, 132 S. Ct. at 1332 (providing

that its finding was in line with every Court of Appeals decision on the same issue).  Accordingly, the Court finds that Leahy-Lind's claim for violations of her FMLA rights to self-care against Defendant CDC is barred by the State's Eleventh Amendment immunity.  Therefore, the Court finds that Count III of the Original and Amended Complaint fails to state a claim and is futile, and, therefore, GRANTS the Motion to Dismiss as to Count III.

### B.    Defamation Claims

Three counts of the Amended Complaint sound in defamation.  In Count VII of the Amended Complaint, Leahy-Lind alleges defamation against Pinette.  (Am. Compl. ¶¶ 109-13.) The Amended Complaint can be read to allege two occurrences of defamation by Pinette.[5]  First, after Leahy-Lind returned to work in April of 2013, Pinette, with Zukas and Sockabasin, falsely stated that Leahy-Lind was a safety threat and made false statements about her mental health and that she was a liar and untrustworthy.  (Id. ¶ 41.)  Second, on September 24, 2013, Pinette publicly stated that those who had spoken to the press about the CDC were liars.  (Id. ¶¶ 111, 80-82.)  In Count VIII of the Amended Complaint, Leahy-Lind alleges that Sockabasin defamed her when Sockabasin said to the consultant engaged to conduct the Report that "Sharon is crazy."  (Id. ¶¶ 46, 47, 116.)  In Count X, Woodbury alleges that Pinette defamed her when Pinette publicly stated at a meeting on September 24, 2013 that Woodbury and others who had spoken to the press about the hostile work environment at the CDC were liars.  (Am. Compl. ¶¶ 80, 124.)

To state a cause of action for defamation in Maine, a plaintiff must sufficiently allege:

---

[5]  In Plaintiff's Objection to Defendants' Motion to Dismiss in Part with Incorporated Memorandum of Law (ECF No. 18) ("Obj. to Mot. to Dismiss"), Leahy-Lind also alleges that Pinette defamed her when "Pinette intentionally and falsely stated that Plaintiff 'shared inappropriate and/or untruthful information with supervisors, subordinates, and/or peers to include, but not limited to, confidential information from senior management discussions."  (Obj. to Mot. to Dismiss at 8 (citing Compl. ¶ 31).)  Turning to the Original and Amended Complaints, there is no indication in the relevant paragraphs that Pinette was the speaker of the allegedly defamatory comments.  (See Compl. ¶ 31; Am. Compl. ¶ 35.)  Therefore, the Court will not further consider these comments as a basis for Leahy-Lind's claim of defamation against Pinette.

(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Lester v. Powers, 596 A.2d 65, 69 (Me.1991) (quoting Restatement (Second) of Torts § 558).

Defendants advance several arguments that each of the claims of defamation should be dismissed. The Court will address each in turn.

## 1.    Public Figure Analysis For Leahy-Lind

In Counts VII and VIII of the Amended Complaint, Leahy-Lind asserts a cause of action for defamation against Defendant Pinette and Sockabasin, respectively.  Defendants assert that Leahy-Lind is a limited public figure or a public official and must therefore allege actual malice in order to state a cause of action for defamation.

To protect the First Amendment from the chilling effects of defamation actions, where the plaintiff alleging defamation is either a public figure or public official, in addition to the basic requirements for a claim of defamation, the plaintiff must also sufficiently allege that the statements were made with "actual malice," which means that the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).  Both the public figure and public official inquiries are necessarily fact specific, and, accordingly, it may not be possible to resolve the issue until the factual record is further developed.  See Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 204 (1st Cir. 2006) (noting that the determination of whether an individual is a public figure is a legal question that should be

answered early in the litigation but that because it is a fact-laden question may not be possible to resolve until trial).[6]

Individuals generally become public figures in one of two ways: "(1) when persons 'assume[] roles of especial prominence in the affairs of society,' perhaps by occupying positions of 'persuasive power and influence,' or (2) when persons 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" Pendleton v. City of Haverhill, 156 F.3d 57, 67 (1st Cir. 1998) (quoting Gertz, 418 U.S. at 345). In addition, a person can be classified as either a public figure for all purposes or only "for a limited range of issues." Gertz, 418 U.S. at 351. Where a plaintiff falls on this scale is determined "by looking to the nature and extent of an individual's participation in the particular controversy." Id. at 352.

---

[6] The Court pauses here to discuss the appropriate universe of documents before the Court on a 12(b)(6) motion to dismiss and on a futility analysis. Ordinarily, a court may not consider any documents outside of the complaint or not expressly incorporated in the complaint on a 12(b)(6) motion to dismiss, without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(b); Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). There is a narrow exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)). In this case, Defendants attached five documents to their Motion: (1) April 2, 2013 Maine Human Rights Commission Charge (ECF No. 5-1) ("Exhibit 1"); (2) April 3, 2013 Lewiston Sun Journal Article (ECF No. 5-2) ("Exhibit 2"); (3) April 4, 2013 Lewiston Sun Journal Article (ECF No. 5-3) ("Exhibit 3"); (4) a State of Maine Performance Management Form for Leahy-Lind (ECF No. 5-4) ("Exhibit 4"); and (5) a State of Maine Administrative Report of Work Content (ECF No. 5-5) ("Exhibit 5").

The Court will consider Exhibits 1 and 3, but declines to consider the remainder of these documents on the motions before the Court. Exhibits 1 and 3 are explicitly referenced and central to Leahy-Lind's allegations. Leahy-Lind alleges that she was retaliated against for speaking out publicly via the April 2, 2013 Maine Human Rights Commission Charge and for speaking to the press on April 4, 2013. (See Am. Compl. ¶¶ 38-40.) However, the Court notes that those documents add little to the factual detail of this case. The Human Rights Charge echoes the Amended Complaint, and the April 4, 2013 newspaper article contains Leahy-Lind's statement found in the Amended Complaint. (See Am. Compl. ¶ 39.)

With regard to Exhibits 2, while the Amended Complaint discusses speaking to the press, the date provided is April 4, 2013 – not April 3, 2013, the date of Exhibit 2. (See Am. Compl. ¶ 39.) Exhibit 4, the State of Maine Performance Management Form for Leahy-Lind, is not referenced in the Complaint nor is it central to Leahy-Lind's claims. There are two passing references to Leahy-Lind's performance evaluation, purportedly found at Exhibit 5, but passing references do not make the document central to Plaintiff's allegations. (See Am. Compl. ¶ 32; Am. Compl. ¶ 27.) The Court finds that these are not the type of documents the First Circuit intended to be considered on the motions before the Court.

In determining whether an individual qualifies as a public figure, courts generally engage in a three step analysis, which is necessarily fact-bound. See, e.g., Pendleton, 156 F.3d at 68-70; Norris v. Bangor Pub. Co., 53 F. Supp. 2d 495, 503-05 (D. Me. 1999). First, the Court must evaluate whether a public controversy existed prior to the publication of the defamatory statement. Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 590 (1st Cir. 1980); Norris, 53 F. Supp. 2d at 503. Next, the Court must consider whether Plaintiff voluntarily injected herself into the controversy, which requires looking "to the nature and extent of [plaintiff's] participation in the particular controversy." Bruno, 633 F.2d at 591 (quoting Gertz, 418 U.S. at 352). Finally, the Court considers whether a plaintiff had greater access to the media as a means of self-help. Gertz, 418 U.S. at 344.

First, the Court reasonably finds that a public controversy in this case arose in early April of 2013, prior to the publication of the allegedly defamatory comments. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 590 (1st Cir. 1980); Norris, 53 F. Supp. 2d at 503. In early April of 2013, Leahy-Lind filed her Charge of Discrimination with the Maine Human Rights Commission that detailed the alleged document shredding and alteration of funding for the Maine Healthy Partnerships at the CDC and was "published in the media and reported on widely." (Am. Compl. ¶ 38.) The next day, April 4, 2013, Leahy-Lind spoke publicly about the same subject matter. The allegations of government malfeasance, widely reported in the media, created a public controversy. See Norris, 53 F. Supp. 2d at 503 (establishing three maxims with regard to what qualifies as a public controversy: "purely private disputes do not give rise to public controversies, the implications of the controversy in question must affect the public and not merely the litigants, and the public importance of the issues involved must be considered"). The Court must consider whether the defamatory statements were made before or after the rise of the public controversy.

The Amended Complaint sets forth three occurrences of alleged defamation regarding Leahy-Lind. First, the Amended Complaint alleges that Pinette defamed Leahy-Lind on September 24, 2013, when Pinette publicly stated those who had spoken about the hostile work environment at the CDC were liars. (Am. Compl. ¶¶ 80, 111.) Second, on an undefined date but after the Charge and speaking publicly, Pinette made false statements about Leahy-Lind's mental health and that Leahy-Lind was a safety threat and untrustworthy. (Id. ¶ 41.) Third, Sockabasin allegedly defamed Leahy-Lind when she said to the consultant engaged to conduct the Report that "Sharon is crazy." (Id. ¶¶ 46, 47, 116.) From the timeline in the Amended Complaint, it appears that the statement was made after April of 2013. Accordingly, from the allegations in the Amended Complaint, a public controversy existed prior to the alleged defamatory comments.

The Court next considers whether Leahy-Lind injected herself into the controversy, which requires the Court to look "to the nature and extent of [Leahy-Lind's] participation in the particular controversy." See Bruno, 633 F.2d at 591. The Amended Complaint reveals that Leahy-Lind twice spoke publicly regarding the public controversy – and arguably created the controversy – concerning the document shredding and the HMP funding. (See Am. Compl. ¶¶ 38, 39.) In speaking publicly, and seeking out the media, Leahy-Lind spoke with the "goal to shine light on one area of state government that is broken and causing harm to me and the people of Maine." (Am. Compl. ¶ 39.) Even from the limited facts available in the Amended Complaint and construing the facts in the light most favorable to Leahy-Lind, the Court finds that Leahy-Lind injected herself into the public controversy. Through her own purposeful actions of seeking out the media and filing the Charge, Leahy-Lind sought to attain a position in the limelight. See Lohrenz v. Donnelly, 350 F.3d 1272, 1280, 1282 (D.C. Cir. 2003) (finding that it was the naval aviator's "voluntary act of 'choosing combat aircraft,' thereby assuming the risk of a combat

assignment, followed by her 'suiting up' as one of the first two American women combat pilots, that gave her 'special prominence' in the controversy about women in combat and established her voluntary limited-purpose public figure status".)

Finally, the Court considers whether Leahy-Lind had greater access to the media as a means of self-help. "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then private individuals normally enjoy." Gertz v. Robert Welch, Inc., 418 U.S. 323, 344 (1974). Here, Leahy-Lind voluntarily sought out and was able to speak through the media. (Am. Compl. ¶ 39; Exhibit 3.) She was able to reach out and avail herself of effective channels of communication. Accordingly, the Court finds that for purposes of the Motions currently before the Court, Leahy-Lind was a limited purpose public figure.[7]

Therefore, to state a claim for defamation, Leahy-Lind must comply with the New York Times v. Sullivan standard and assert actual malice. The Amended Complaint specifically alleges that the first and third occurrences of defamation – the "liar" comment by Pinette and the "crazy" comment by Sockabasin – were made with actual malice. (Am. Compl. ¶¶ 47, 82.) The second occurrence of defamation – the alleged statements about Leahy-Lind's mental health and that Leahy-Lind was a safety threat and untrustworthy – are not accompanied by any allegation of actual malice. Therefore, those statements cannot form the basis of a claim of defamation by Leahy-Lind.

In short, to the extent that any allegation of defamation by Leahy-Lind is premised on the statements by Pinette that Leahy-Lind was untrustworthy, a safety threat or regarding her mental health, those claims of defamation fail to state a claim and are futile for failure to comply with the

---

[7]  Because the Court finds that Leahy-Lind was a limited purpose public figure, the Court will not separately analyze whether Leahy-Lind qualified as a public official.

requirements of <u>New York Times v. Sullivan</u>. Therefore, Defendants' Motion to Dismiss is GRANTED on that basis for Count VII of the Original and Amended Complaints. To the extent that Leahy-Lind alleges defamation premised on the statements by Pinette that Leahy-Lind was a liar and by Sockabasin that Leahy-Lind was crazy, the Motion to Dismiss is DENIED and the claims are not futile.

### 2. Unactionable Hyperbole

Defendants next argue that the statements underlying Leahy-Lind and Woodbury's defamation claims are hyperbole and insufficiently fact-based and, therefore, cannot form the basis for a defamation claim. "Only statements that are provable as false are actionable under defamation . . . . the Constitution protects as 'opinions' statements that do not 'contain a provably false factual connotation.'" <u>Levesque v. Doocy</u>, 557 F. Supp. 2d 157, 164 (D. Me. 2008) <u>aff'd</u>, 560 F.3d 82 (1st Cir. 2009) (citing <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 19-20 (1990).) However, "[a] statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable." <u>Levinsky's, Inc. v. Wal-Mart Stores, Inc.</u>, 127 F.3d 122, 127 (1st Cir. 1997). Statements of opinion that imply the existence of underlying factual support may form the basis for a defamation claim, but statements of "imaginative expression" and "rhetorical hyperbole" are protected speech. <u>Id.</u> at 128. "Thus, the First Amendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts." <u>Id.</u>

In distinguishing actionable opinion from unactionable hyperbole, "[c]ontext matters in assessing such claims and the Court must examine the statement in its totality in the context in which it was uttered or published and consider all the words used, not merely a particular phrase or sentence." <u>Freeman v. Town of Hudson</u>, 849 F. Supp. 2d 138, 161 (D. Mass. 2012) <u>aff'd</u>, 714

F.3d 29 (1st Cir. 2013) (internal citations omitted) (examining the context in considering whether a statement that an individual was a "liar" was susceptible to a defamatory meaning under Massachusetts law); see also Levinsky's Inc., 127 F.3d at 130-31 (stating that "[c]ertain excesses of language cannot ground a defamation claim because, in context, those excesses involve only puffery or epithets, and thus are insufficiently fact-based.").  Leahy-Lind and Woodbury's defamation claims arise out of a statement by Pinette that Leahy-Lind and Woodbury were "liars" when they spoke to the press about the conditions at the CDC.  (Am. Compl. ¶¶ 80-82.)  Leahy-Lind also alleges a claim of defamation against Sockabasin for telling the consultant that "Sharon is crazy."  (Id. ¶¶ 46-47.)  Defendants argue that these statements are not provable as false and amount to mere hyperbole.

First, the Court considers the context surrounding the statement that Leahy-Lind and Woodbury were liars by Pinette.  Leahy-Lind and Woodbury had spoken publicly regarding the conditions at the CDC, including an alleged manipulation of government funding, document shredding and a hostile work environment.  (Am. Compl. ¶¶ 38-39, 55-56, 62.)  After those statements were made to the press, the director of the CDC, Pinette, announced that the individuals who made those statements were lying.  (Id. ¶¶ 80-82.)  The implication of that statement is that Pinette, as the Director, was in possession of knowledge of facts that could show that Leahy-Lind and Woodbury were not telling the truth.  This is the example provided by the First Circuit of an actionable opinion:  "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth,' and the comment can be actionable."  Levinsky's Inc., 127 F.3d at 127 n.3.  The statement by their boss that Leahy-Lind and Woodbury were liars is a far cry from the case cited by Defendants, Freeman v. Town of Hudson, where the Chair of the Conservation Commission called the plaintiff a liar at a

Conservation Commission meeting and then said, "If I was a farmer, I would not put the fox in charge of the henhouse because all the hens will disappear." 849 F. Supp. 2d 138, 160 (D. Mass. 2012). In that case, the court considered the context to find that those "statements are not reasonably susceptible to defamatory meaning." Id. at 161. At this stage of the litigation, the Court finds that the statement that Leahy-Lind and Woodbury were liars may amount to actionable defamation.

Turning to the alleged defamatory comment that Leahy-Lind was crazy, the Court notes that this statement is a closer call. First, there is simply less context surrounding the statement. (See Am. Compl. ¶¶ 42-48.) The Amended Complaint provides that the CDC hired a consultant to conduct a Cultural Competency Assessment (the "Report") of the organization, and that Sockabasin knowingly told the consultant that Leahy-Lind is "crazy" in an effort to tarnish Leahy-Lind's professional reputation. (Id. ¶¶ 42, 46-47.) Looking to the broader context, the Amended Complaint alleges that the Report occurred in the midst of an effort by Sockabasin, and others, to undermine Leahy-Lind at the CDC. (See Am. Compl. ¶¶ 40-41.) Construing the facts in the light most favorable to Leahy-Lind, the Court is unwilling to state at this stage of the litigation that the statement that Leahy-Lind was "crazy" is mere hyperbole. Instead, the implication is that Sockabasin was in possession of facts that could show that Leahy-Lind was mentally incompetent in order to further undermine Leahy-Lind at the CDC and with the consultant. Therefore, the Court DENIES Defendants' Motion to Dismiss and finds that the claims are not futile on that basis.

### 3.     Conditional Privilege

Defendants briefly argue that even if Leahy-Lind and Woodbury state claims for defamation, Pinette and Sockabasin are entitled to a conditional privilege, which "arises in settings where society has an interest in promoting free, but not absolutely unfettered, speech." Lester v.

Powers, 596 A.2d 65, 69 (Me. 1991). Courts have found the conditional privilege against liability for defamation where a student wrote a letter detailing her perception of a professor's conduct during a class as part of the tenure review process, Lester, 596 A.2d at 70, and where an employer made statements about an employee in the course of terminating that employee, Cole v. Chandler, 752 A.2d 1189, 1193-94 (Me. 2000). Where a conditional privilege exists, a defendant may only be found liable for defamation where the person who made the statements loses the privilege by abusing it. Lester, 596 A.2d at 69. "Such an abuse occurs when the person either knows the statement to be false or recklessly disregards its truth or falsity." Id.

Defendants argue that Pinette and Sockabasin are entitled to a conditional privilege because the alleged defamatory statements were made internally about important matters to the CDC. (See CDC Opp'n at 6.) At this point in the litigation, the Court does not find that false statements by the Director of the CDC and Sockabasin to colleagues, subordinates and an outside consultant amount to a setting "in which an important interest of the recipient of a defamatory statement will be advanced by frank communication." Cole, 752 A.2d at 1193. Even if the Court found that a conditional privilege attached here, the Amended Complaint specifically alleges that Pinette and Sockabasin made the statements with knowledge that they were false or with reckless disregard for their truth. (Am. Compl. ¶¶ 47, 82.) Therefore, the Court DENIES Defendants' Motion to Dismiss and finds that the claims are not futile on that basis.

### 4.    Workers Compensation Exclusivity

Defendants also argue that Leahy-Lind and Woodbury's claims for defamation must be dismissed because they are barred by the exclusivity provision of the Maine Workers' Compensation Act, 39-A M.R.S.A. § 104. The Act provides, in pertinent part:

> An employer who has secured the payment of compensation in conformity with sections 401 to 407 is exempt from civil actions, either at common law or under

sections 901 to 908; Title 14, sections 8101 to 8118; and Title 18-A, section 2-804, involving personal injuries sustained by an employee arising out of and in the course of employment, or for death resulting from those injuries.

Id.  As Leahy-Lind acknowledges, "personal injuries sustained by the Plaintiff on the job are covered by the Workers' Compensation Act."  (Pls.' Obj. To Defs.' Mot. To Dismiss In Part With Incorporated Mem. Of Law (ECF No. 18) at 7.)  In Cole v. Chandler, the plaintiff asserted a defamation claim against his former employer and colleagues for statements made during the course of the plaintiff's employment.  752 A.2d 1189, 1194 (Me. 2000).  The Law Court found that while any mental or physical injuries fall within the exclusivity provision, economic or reputational injuries do not come within the exclusivity provision:

> [M]ental injuries constitute personal injuries within the meaning of the exclusivity provision of the Workers' Compensation Act and thus an independent claim is barred.  [Plaintiff's] claims for defamation, invasion of privacy and interference with advantageous economic relations, however, are broad enough to include recovery for economic injuries, as well as mental or physical injuries.  As with the claim for intentional infliction of emotional distress, any mental or physical injuries included within these claims are personal injuries and thus recovery is barred by the exclusivity provision.  On the other hand, the economic or reputational injuries, if any, do not constitute personal injuries, as they are not physical or mental injuries.  Therefore, the recovery of such damages is not precluded by the exclusivity provision.

Id. at 1196.  Therefore, to the extent that Leahy-Lind or Woodbury seek damages for personal injuries sustained during the course of their employment, either mental or physical, those damages are barred by the exclusivity provision of the Workers' Compensation Act.  To the extent that Leahy-Lind or Woodbury seek damages for economic or reputational injuries from their defamation claims, those damages are not barred.  See id.

In summary, to the extent that any allegation of defamation by Leahy-Lind is premised on the statements by Pinette that Leahy-Lind was untrustworthy, a safety threat or regarding her mental health, those claims of defamation fail to state a claim and are futile for failure to allege

actual malice.  (See Am. Compl. ¶ 41.)  Any claim for damages from personal injuries sustained

during the course of their employment are barred by the Maine Workers' Compensation Act, 39-

A M.R.S.A. § 104.  The remainder of Leahy-Lind and Woodbury's claims for defamation remain.

The Motion to Dismiss is GRANTED IN PART and DENIED IN PART as to Count VII.

### C.      First Amendment Retaliation

Leahy-Lind and Woodbury allege retaliation in violation of their First Amendment rights

for adverse employment actions suffered after they spoke publicly and to the media in Counts IX

and XI, respectively.  The Supreme Court has made clear that "public employees do not surrender

all their First Amendment rights by reason of their employment.  Rather, the First Amendment

protects a public employee's right, in certain circumstances, to speak as a citizen addressing

matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  To determine whether

an adverse employment action has violated a public employee's First Amendment free speech

rights, the First Circuit has articulated a three-part inquiry.

> First, a court must determine whether the employee spoke as a citizen on a matter
> of public concern.  Second, the court must balance the interests of the employee, as
> a citizen, in commenting upon matters of public concern and the interest of the
> State, as an employer, in promoting the efficiency of the public services it performs
> through its employees.  Third, the employee must show that the protected
> expression was a substantial or motivating factor in the adverse employment
> decision.  If all three parts of the inquiry are resolved in favor of the plaintiff, the
> employer may still escape liability if it can show that it would have reached the
> same decision even absent the protected conduct.

Decotiis v. Whittemore, 635 F.3d 22, 29-30 (1st Cir. 2011) (internal citations, quotations and

punctuation omitted).  Defendants mount several arguments to the claims raised by Leahy-Lind

and Woodbury: (1) Leahy-Lind did not speak as a citizen because any speech was pursuant to her

employment duties;[8] (2) Woodbury did not speak on a matter of public concern but only as to internal working conditions of the CDC; (3) Neither Leahy-Lind nor Woodbury have shown sufficient adverse employment actions; and (4) Even if Leahy-Lind and Woodbury were able to state a claim for retaliation, Pinette, Zukas and Sockabasin are entitled to qualified immunity.

### 1. Whether Leahy-Lind Spoke As A Citizen

Defendants assert that any public speech by Leahy-Lind was pursuant to her official duties and is therefore unactionable. While "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens," when public employees "make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 420, 421. The First Circuit has emphasized a two-step, context-specific inquiry, to ascertain whether speech is "made pursuant to the employee's official duties." Decotiis, 635 F.3d at 31. "First, a court must ask, what are the employee's official responsibilities?, and second, was the speech at issue made pursuant to those responsibilities?" Id. (internal quotations and citations omitted).

The Court notes that at this juncture, it is hampered by the posture of this case and the briefing provided by all parties. The Amended Complaint is devoid of many facts that would supply the context for Leahy-Lind's responsibilities, her actions and her speech.[9] (See, e.g., Am.

---

[8] The CDC argues that, "Woodbury also alleges that she made those statements in her official capacity as an employee of CDC." (CDC Opp'n at 9.) The CDC provides no citation to support this statement, and the Court could not locate any allegation by Woodbury stating that she made any statement in her official capacity as an employee of the CDC.

[9] Even if the Court were to step beyond the bounds of the Amended Complaint and consider the purported job description appended to the Motion to Dismiss, the Supreme Court and the First Circuit have indicated that the inquiry into the employee's job responsibilities should focus on the "'practical' rather than formal, focusing on the duties an employee is actually expected to perform and not merely those formally listed in the employee's job description." Decotiis, 635 F.3d at 32. Further, the Court notes that the two permissible addenda to the Motion to Dismiss provide no additional factual detail regarding Leahy-Lind's employment responsibilities.

Compl. ¶ 11.) Defendants make no attempt to engage in the detailed analysis deemed necessary by the First Circuit. (Mot. to Dismiss at 14.) Nonetheless, the Court will briefly engage in the analysis. From the Amended Complaint, the Court can discern the following about Leahy-Lind's employment responsibilities: Leahy-Lind was the Director of the Division of Local Public Health at the CDC. (Compl. ¶ 7; Am. Compl. ¶ 11.) Her supervisor was the Deputy Director of the CDC. (Id. ¶ 11; Am. Compl. ¶ 15.) Upon close inspection of the Amended Complaint, it appears that Leahy-Lind exercised little independent control over any management responsibilities, including hiring, supervision and discipline of other employees. Instead, she was ordered to discipline (Compl. ¶ 18.a.; Am. Compl. ¶ 22.a.), ordered to fail an employee (Compl. ¶ 18.j.; Am. Compl. ¶ 22.j.), discouraged from questioning practices within the office (Compl. ¶ 18.i.; Am. Compl. ¶ 22.i.), and participated in the hiring process but was denied the ability to hire the person she believed best qualified (Compl. ¶ 35; Am. Compl. ¶ 49).

The First Circuit has outlined several contextual factors to aid courts in engaging in the context-specific inquiry:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance; whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech[.]

Decotiis, 635 F.3d at 32 (internal citations, punctuation and quotations omitted). In this case, there is no indication that it was part of Leahy-Lind's employment responsibilities to report to the press. There is no indication that Leahy-Lind was instructed or authorized to make the statements. Leahy-Lind undoubtedly learned of the subject matter of the speech from her employment, which may tend to show that the speech was made pursuant to her official duties. In Williams v. Dallas

Indep. School District, the Fifth Circuit found that a public employee authored and sent a memoranda to his superior pursuant to his official responsibilities where the information contained in the memoranda was learned from his employment and the communication with his superior was necessary for him to do his job. 480 F.3d 689, 694 (5th Cir. 2007). That is not the case here. Instead, the Amended Complaint plausibly alleges that Leahy-Lind raised alleged government malfeasance outside of her chain of command, including to the press. There is no basis to conclude that Leahy-Lind had the CDC's backing in making the statements. See Decotiis, 635 F.3d at 33; see also Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 27 (1st Cir. 2010) ("The [Supreme] Court did not expressly indicate that it meant to sweep more broadly and include, for example, all speech that relates to, contributes to, or incidentally facilitates the performance of official functions."). Accordingly, the Court cannot say that Leahy-Lind's speech was performed in the course of her official duties; rather, she spoke as a citizen. See Decotiis, 635 F.3d at 34-35, 35 n.15 (stating that "it is sufficient that the complaint alleges facts that plausibly set forth citizen speech" and noting that "the fact-intensive nature of the Garcetti analysis does not easily lend itself to dismissal on a Rule 12(b)(6) motion").

### 2. Whether Woodbury Spoke On A Matter Of Public Concern

Defendants assert that Woodbury did not speak on a matter that was of concern to the public. Defendants specifically argue that Woodbury's allegations "are a litany of personal complaints about her alleged working condition[s] and perceived slights at the hands of management." (Pinette Opp'n at 7; see also CDC Opp'n at 9 ("Woodbury claims that she engaged in protected speech by criticizing the management style of Sockabasin, Zukas, and Pinette.").) Reviewing the Amended Complaint, it is plain that Woodbury alleges that she spoke on more than just the management of the CDC. Instead, Woodbury alleges that when she spoke to the Lewiston

Sun Journal, she "echoed many of [Leahy-Lind's] claims, including the allegation that Healthy Maine Partnership funding was manipulated." (Am. Compl. ¶ 55.) While it is true that the First Amendment "does not empower [public employees] to constitutionalize the employee grievance," Garcetti, 547 U.S. at 420, it is also true that certain speech is of an inherent public concern, "such as official malfeasance or the neglect of duties." Decotiis, 635 F.3d at 30.

In Decotiis, the First Circuit readily found that when a state-licensed speech and language therapist informed parents that the agency charged with providing services may have been withholding services to which their children were entitled, the speech "plainly relate[d] to a matter of inherent concern." Id. Similarly, when Woodbury spoke to the press about alleged manipulation of government funding of the Healthy Maine Partnership program, her speech was a matter of inherent public concern. See id.

### 3. Adverse Employment Actions

Defendants argue that the retaliatory acts alleged by Leahy-Lind and Woodbury are insufficient to state a claim. To state a claim for First Amendment retaliation, it is not necessary for a plaintiff to allege an "adverse employment action" as that term is understood in the Title VII context. Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011). Instead, "the 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views – or, more generally, on whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights." Id. (internal citations and punctuation omitted). Accordingly, the First Circuit has emphasized that the appropriate inquiry is "whether the defendant's actions would deter a reasonably hardy individual from exercising his constitutional rights." Id. (internal citations and punctuation omitted). "A campaign of informal harassment, for example, would

support a First Amendment retaliation claim if the alleged harassment would have such a chilling effect."  Id.  The Court first examines whether Leahy-Lind has alleged sufficient adverse actions and then turns to Woodbury.

Leahy-Lind alleges several sets of retaliatory acts.  First, Leahy-Lind alleges that because of her public speech, she became the subject of a witch hunt and was publicly discredited.  (Compl. ¶ 34; Am. Compl. ¶ 40.)  For example, Pinette, Sockabasin and Zukas allegedly made false complaints that Leahy-Lind was a "safety threat."  (Compl. ¶ 34; Am. Compl. ¶ 41.)  They also allegedly made false statements about Leahy-Lind's mental health, stated publicly that she was a liar and untrustworthy, shot her nasty looks and treated her with disdain.  (Compl. ¶ 34; Am. Compl. ¶ 41.)  Second, Leahy-Lind alleges that after she returned to work, the conditions of her employment were altered: her hours were restricted, she was held to different standards than prior to speaking out, she was not given discretion in hiring, employees who supported her were mistreated, she was escorted into human resources, instead of being "buzzed" in, she was not permitted an office phone, she was micromanaged and she was counseled on trivial matters. (Compl. ¶ 33; Am. Compl. ¶ 37.)  Finally, Leahy-Lind alleges that the conditions of her work became intolerable after she was asked to be a party to a hiring process that she believed was unfair and denied her ability to employ the best candidate.  (Compl. ¶ 35; Am. Compl. ¶ 49.)

Defendants argue that the alteration in Leahy-Lind's conditions of employment and the campaign to publicly discredit Leahy-Lind cannot support a First Amendment retaliation claim. Defendants argue that "there is no First Circuit precedent supporting a finding that negative remarks, standing alone, are enough to support a retaliation claim under the First Amendment." (Mot. to Dismiss at 18.)  It is true that the First Circuit and other courts have found that mere verbal insults are not sufficient to deter reasonably hardy individuals from exercising their First

Amendment rights.  See, e.g., Rosario-Urdaz v. Velazco, 433 F.3d 174, 179 (1st Cir. 2006) (finding that a single insult by a co-worker was insufficient); Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003) (cited approvingly in Barton, 632 F.3d at 29-30 and stating that being "bad-mouthed and verbally threatened" was too insignificant); McKee v. Hart, 436 F.3d 165, 170-71 (3rd Cir. 2006) (cited approvingly in Barton, 632 F.3d at 30 and finding that three critical comments by a supervisor regarding plaintiff's job performance would not have deterred a person of ordinary firmness from exercising their constitutional rights).  However, the First Circuit has also stated that "[e]ven 'relatively minor events' can give rise to § 1983 liability, so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights."  Barton, 632 F.3d at 29.  The First Circuit went on to explain that "a campaign of harassment can support a First Amendment retaliation claim if the harassment would deter a reasonably hardy individual in the exercise of his or her First Amendment rights."  Id. at 30 (stating also that the contours of the holding were clearly established by 2006 or 2007).

For example, in Pieczynski v. Duffy, the Seventh Circuit found that the jury could have believed that the plaintiff was a victim of a "calculated campaign to humiliate her, drive her to resign, even break her health" in retaliation for her protected speech when her employer confined her to monotonous paperwork, terminated her supervisory authority, removed her long-distance line, denied her requests for vacation time and refused her request to change her lunch hour, among other acts.  875 F.2d 1331, 1335 (7th Cir. 1989) (cited approvingly in Barton, 632 F.3d at 30).  The Seventh Circuit held that "a campaign of petty harassments directed against a public employee in retaliation for his political beliefs or affiliations violates the First Amendment."  Id. at 1336. Similarly, in Manzer v. Town of Anson, this Court found sufficient adverse action where a road commissioner engaged in a campaign of harassment against equipment operators and drivers after

they attempted to speak regarding unsafe and illegal practices by the Town of Anson. 771 F. Supp. 2d 121, 131-32 (D. Me. 2011). The Court found a campaign of harassment where over the course of several months the road commissioner deleted overtime from the equipment operators and drivers' time cards, forced them to work unnecessarily during Selectmen's meetings and threatened their employment. Id. In addition, the Court held that the complaint sufficiently stated a cause of action against the Town's Selectmen, the road commissioner's superiors, because the Complaint raised a reasonable inference that the Selectmen knew of the protected speech and, through inaction, tacitly authorized the campaign of harassment. Id. at 132. In this context, "a campaign of harassment, 'knowingly tolerated by superiors' can form the basis for a § 1983 claim." Id. at 131 (quoting Rosario-Urdaz, 433 F.3d at 179).

Leahy-Lind has alleged more than mere insults by Pinette, Zukas and Sockabasin. Instead, the Amended Complaint reveals a campaign to discredit her and break her down. (Am. Compl. ¶¶ 37, 40-41.) Each individual action on its own may be a mere nuisance, but taken as a whole, the message was clear: Leahy-Lind was being punished for exercising her First Amendment rights. See Pieczynski, 875 F.2d at 1335. While the Amended Complaint does not put a specific actor to some of the allegations, the logical inference is that the same individuals who sought to publicly discredit Leahy-Lind were responsible for the alterations in her employment, Pinette, Zukas and Sockabasin. Indeed, the reasonable and logical inference is that Zukas, the Deputy Director of the CDC and Leahy-Lind's supervisor, and Pinette, the Director of the CDC and a superior to Leahy-Lind, were responsible for or knew of and failed to correct the actions alleged. As in Manzer v. Town of Anson, the Court finds that the Amended Complaint raises a reasonable inference that Zukas, Pinette and Sockabasin were responsible for a campaign of harassment sufficient to deter a reasonably hardy individual from exercising her First Amendment rights.

Turning to Woodbury, the Court readily finds that the acts alleged by Woodbury following her statements to the press amount to sufficient adverse action. The conduct alleged is more than the mere insults found insufficient by the First Circuit. See Rosario-Urdaz, 433 F.3d at 179. Instead, as alleged, the conduct endured by Woodbury would deter a reasonably hardy individual from exercising her First Amendment rights: she was shunned by coworkers, she was followed by Zukas and Sockabasin but they refused to speak to her, she was ignored in meetings, her office was repeatedly moved, she was removed from two committees, she was placed under supervision of someone about whom she had made a complaint, her time forms were questioned, when she asked not to have to report to Zukas and Sockabasin, she was told she should not have spoken to the press and the director of the organization called her a liar. (See Am. Compl. ¶¶ 66, 68, 75, 78, 80.) As pled, this conduct amounts to a campaign of harassment. See Pieczynski, 875 F.2d at 1335; Manzer, 771 F. Supp. 2d at 131-32.

Defendant Pinette argues that she is named as the actor in only one of the acts alleged, and therefore the Amended Complaint does not state a claim for First Amendment retaliation against her. (Pinette Opp'n at 8.) To the extent that Pinette or the CDC argue that Pinette, Zukas or Sockabasin did not play a sufficient role in the retaliation, the Court finds that the Amended Complaint is being read too narrowly. The Amended Complaint depicts a campaign by Pinette, Zukas and Sockabasin to intimidate and punish Woodbury for speaking publicly about the CDC. The logical inference is that the three named individuals were responsible for the acts alleged. At a minimum, Pinette, as the Director of the CDC, knowingly tolerated a campaign of harassment. See Manzer, 771 F. Supp. 2d at 131 (quoting Rosario-Urdaz, 433 F.3d at 179).

### 4. Qualified Immunity

Finally, Defendants CDC and Pinette argue that even if Leahy-Lind and Woodbury have stated a claim for First Amendment retaliation, Pinette, Zukas and Sockabasin are entitled to qualified immunity. Qualified immunity is to be decided as early as possible in litigation as qualified immunity provides immunity from suit and is not a mere defense to liability. <u>Decotiis</u>, 635 F.3d at 36.

> A plaintiff may overcome qualified immunity by first making out the violation of a constitutional right, and second, establishing that the right was "clearly established" at the time of the defendant's alleged violation. The "clearly established" step comprises two subparts: first, whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right, and second, whether in the specific context of the case, a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.

<u>Id.</u> (internal citations and punctuation omitted). In the Motion to Dismiss, Pinette and the CDC argued that "[c]ounsel has not located precedent from the Supreme Court, the First Circuit, this Court or the Maine Law Court which supports the proposition that Leahy-Lind asserts here – that statements unaccompanied by intimidation, threats and coercion can support a First Amendment § 1983 retaliation claim." (Mot. to Dismiss at 19.) Additionally, in response to the Motion to Amend, the CDC asserted that "there is no legal precedent supporting the First Amendment retaliation claims in this matter and, therefore, those claims are futile." (CDC Opp'n at 1; Pinette Opp'n at 10.) As the preceding discussion illustrates, however, Leahy-Lind and Woodbury have advanced more than Defendants suggest. Leahy-Lind and Woodbury have alleged a campaign of harassment that included more than mere negative comments. Leahy-Lind and Woodbury have asserted that Pinette, Zukas and Sockabasin engaged in a campaign of harassment that was sufficient to chill their First Amendment rights. (<u>See</u> Am. Compl. ¶¶ 37, 40-41 66, 68, 75, 78, 80.)

"[F]or the right to be clearly established, the plaintiff must point to controlling authority or a body of persuasive authority, existing at the time of the incident, that can be said to have provided the defendant with 'fair warning.'" Decotiis, 635 F.3d at 37. While the facts of the case may change as litigation progresses, at this point Decotiis, Barton, Rosario-Urdaz and Manzer provide the necessary controlling authority to have provided Defendants with fair warning. In Decotiis, a public employee spoke out to constituents about her belief that her employer was not following the law. Decotiis, 635 F.3d at 31. Decotiis set forth the First Circuit's guidance, applied above, on when public employees speak pursuant to their official duties. Id. at 31-35. Turning to Barton, the First Circuit, in 2011 – preceding the events of this case – held that "even relatively minor events can give rise to liability for retaliation under § 1983, and that a campaign of harassment can support a First Amendment retaliation claim if the harassment would deter a reasonably hardy individual in the exercise of his or her First Amendment rights." Barton, 632 F.3d at 30. In that case, the First Circuit made clear that a public employee need not suffer an "adverse employment action" as that term is understood in the Title VII context and that minor events may be retaliatory. Id. at 29-30. In addition, in 2011, this Court found that a campaign of harassment – tacitly authorized by superiors through inaction – is sufficient to state a claim for First Amendment retaliation. Manzer, 771 F. Supp. at 132. In Manzer, this Court cited a 2006 First Circuit opinion for the proposition that "a campaign of harassment, 'knowingly tolerated by superiors' can form the basis for a § 1983 claim." Id. at 131 (quoting Rosario-Urdaz, 433 F.3d at 179). From at least these cases, Pinette, Zukas and Sockabasin were placed on notice that the conduct alleged in the Amended Complaint violated Leahy-Lind and Woodbury's constitutional rights. At this point in the litigation, the Court is unwilling to say that Pinette, Zukas and Sockabasin are entitled to qualified immunity.

Therefore, the Court finds that Leahy-Lind and Woodbury have stated a claim for First Amendment retaliation and that their claims are not futile. Defendants' Motion to Dismiss the claim for First Amendment Retaliation asserted by Leahy-Lind is thus DENIED.

## IV.  MOTIONS TO INTERVENE

In addition, before the Court are the Zukas Motion to Intervene (ECF No. 31) and the Sockabasin Motion to Intervene (ECF No. 34).  Through these Motions, Christine Zukas and Lisa Sockabasin seek to intervene or appear in this case so that they may file an objection to the Motion to Amend.  In essence, Zukas and Sockabasin seek intervenor status in order to file a preemptive motion to dismiss the claims against them should the Court permit the Motion to Amend.  Zukas and Sockabasin cite only two cases in support of this unique procedural step, without discussion, and neither case is from this Circuit.  Accordingly, the Court declines to allow Zukas and Sockabasin to intervene.  Should Zukas and Sockabasin desire to move to dismiss claims asserted against them, they will be free to avail themselves of the procedural avenues available after they are named as defendants to this case.  Therefore, the Zukas Motion to Intervene and the Sockabasin Motion to Intervene are both DENIED.

## V.  MOTION FOR A MORE DEFINITE STATEMENT

Also before the Court is Defendant Sheila G. Pinette's Motion For More Definite Statement And Incorporated Memorandum Of Law.  (ECF No. 6.)  Between the time Pinette filed for a more definite statement and the issuance of this decision, Leahy-Lind filed an Amended Complaint, addressing many of Pinette's concerns.  To the extent Pinette continues to request a more definite statement, the parties will shortly have at their disposal the many methods of available discovery to both flesh out and nail down the details surrounding the claims.  See Hawkins v. Kiely, 250 F.R.D. 73, 74 (D. Me. 2008) (stating that "Rule 12(e) motions are not favored in light of the

availability of pretrial discovery procedures." (citation and internal quotation marks omitted).) This Motion is DENIED.

## V.     CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the Motion to Amend, adding Katie N. Woodbury as a plaintiff and Christine Zukas and Lisa Sockabasin as defendants.[10]  The Court finds that Count III of the Original Complaint fails to state a claim and Count III of the Amended Complaint is futile, and, therefore, GRANTS the Motion to Dismiss as to Count III.  The Court finds that Count VII of the Original and Amended Complaint asserting defamation against Pinette by Leahy-Lind fails to state a claim, in part, and is futile, in part.  Therefore, the Motion to Dismiss is GRANTED IN PART and DENIED IN PART as to Count VII.  As to the remaining Counts, the Motion to Dismiss is DENIED.  Plaintiffs shall file their Amended Complaint, without the current Count III for violations of the federal Family Medical Leave Act, as a separate entry on the docket by October 3, 2014.  The Motion for a More Definite Statement (ECF No. 6), the Zukas Motion to Intervene (ECF No. 31) and the Sockabasin Motion to Intervene (ECF No. 34) are DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 19th day of September, 2014.

---

[10]  In granting in part the Motion to Amend, the Court notes that Defendants did not object to the addition of Woodbury as a plaintiff to this case.  The Court expresses no opinion as to whether Woodbury may properly remain a plaintiff to this case or whether her case should be severed based on further motion practice and factual development.